SUPREME COURT OF NEW HAMPSHIRE *v.* PIPER

No. 83–1466.   Argued October 31, 1984—Decided March 4, 1985

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, STEVENS, and O'CONNOR, JJ.,

joined. WHITE, J., filed an opinion concurring in the result, *post*, p. 288. REHNQUIST, J., filed a dissenting opinion, *post*, p. 289.

*Martin L. Gross* argued the cause for appellant. With him on the briefs were *Gregory H. Smith*, Attorney General of New Hampshire, and *Martha V. Gordon*.

*Jon Meyer* argued the cause and filed a brief for appellee.*

JUSTICE POWELL delivered the opinion of the Court.

The Rules of the Supreme Court of New Hampshire limit bar admission to state residents. We here consider whether this restriction violates the Privileges and Immunities Clause of the United States Constitution, Art. IV, § 2.

## I

### A

Kathryn Piper lives in Lower Waterford, Vermont, about 400 yards from the New Hampshire border. In 1979, she

---

*Briefs of *amici curiae* urging reversal were filed for the State of Iowa by *Thomas J. Miller*, Attorney General, and *Brent R. Appel*, Deputy Attorney General; for the State of Tennessee by *William M. Leech, Jr.*, Attorney General, *William B. Hubbard*, Chief Deputy Attorney General, and *Andy D. Bennett* and *William P. Sizer*, Assistant Attorneys General; and for the Commonwealth of Virginia et al. by *Gerald L. Baliles*, Attorney General of Virginia, *William G. Broaddus*, Chief Deputy Attorney General, and *Elizabeth B. Lacy*, Deputy Attorney General, *Tany S. Hong*, Attorney General of Hawaii, *Linley E. Pearson*, Attorney General of Indiana, *Robert T. Stephan*, Attorney General of Kansas, *John D. Ashcroft*, Attorney General of Missouri, *Brian McKay*, Attorney General of Nevada, and *William E. Isaeff*, Chief Deputy Attorney General, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Bronson C. La Follette*, Attorney General of Wisconsin, and *Leroy L. Dalton*, Assistant Attorney General, *A. G. McClintock*, Attorney General of Wyoming, *Rufus Edmisten*, Attorney General of North Carolina, and *Harry H. Harkins, Jr.*, Assistant Attorney General, *Jack Pope*, Chief Justice of the Supreme Court of Texas, and *Sarah Singleton*.

Briefs of *amici curiae* urging affirmance were filed for the American Corporate Council Association by *Jerry M. Aufox* and *Thomas I. Davenport;* for the Vermont Bar Association by *James C. Gallagher;* and for Public Citizen, Inc., by *John Cary Sims* and *Alan B. Morrison*.

applied to take the February 1980 New Hampshire bar examination. Piper submitted with her application a statement of intent to become a New Hampshire resident. Following an investigation, the Board of Bar Examiners found that Piper was of good moral character and met the other requirements for admission. She was allowed to take, and passed, the examination. Piper was informed by the Board that she would have to establish a home address in New Hampshire prior to being sworn in.

On May 7, 1980, Piper requested from the Clerk of the New Hampshire Supreme Court a dispensation from the residency requirement. Although she had a "possible job" with a lawyer in Littleton, New Hampshire, Piper stated that becoming a resident of New Hampshire would be inconvenient. Her house in Vermont was secured by a mortgage with a favorable interest rate, and she and her husband recently had become parents. According to Piper, these "problems peculiar to [her] situation . . . warrant[ed] that an exception be made." Letter from Appellee to Ralph H. Wood, Esq., Clerk of N. H. Supreme Court, App. 13.

On May 13, 1980, the Clerk informed Piper that her request had been denied. She then formally petitioned the New Hampshire Supreme Court for permission to become a member of the bar. She asserted that she was well qualified and that her "situation [was] sufficiently unique that the granting of an exception . . . [would] not result in the setting of any undesired precedent." Letter of Nov. 8, 1980, from Appellee to Hon. William A. Grimes, then Chief Justice of the N. H. Supreme Court, App. 15. The Supreme Court denied Piper's formal request on December 31, 1980.

B

On March 22, 1982, Piper filed this action in the United States District Court for the District of New Hampshire. She named as defendants the State Supreme Court, its five

Justices, and its Clerk. She alleged that Rule 42 of the New Hampshire Supreme Court, that excludes nonresidents from the bar,[1] violates the Privileges and Immunities Clause of Art. IV, § 2, of the United States Constitution.[2]

On May 17, 1982, the District Court granted Piper's motion for summary judgment. 539 F. Supp. 1064. The court first stated that the opportunity to practice law is a "fundamental" right within the meaning of *Baldwin* v. *Montana Fish & Game Comm'n,* 436 U. S. 371 (1978). It then found that Piper had been denied this right in the absence of a "substantial reason," 539 F. Supp., at 1072, and that Rule 42 was not "closely tailored" to achieve its intended goals, *id.,* at 1073. The court therefore concluded that New Hampshire's residency requirement violated the Privileges and Immunities Clause.[3]

---

[1] Rule 42 does not provide explicitly that only New Hampshire residents may be admitted to the bar. It does require, however, that an applicant either be a resident of New Hampshire or file a statement of intent to reside there. N. H. Sup. Ct. Rule 42(3). In an affidavit submitted to the District Court, the Chief Justice of the Supreme Court of New Hampshire said that under the Rule, an applicant for admission must be "a *bona fide* resident of the State . . . at the time that the oath of office . . . is administered." Affidavit of John W. King, App. 32. Accordingly, the parties agree that the refusal to admit Piper to the bar was based on Rule 42.

[2] Piper was not excluded totally from the practice of law in New Hampshire. Out-of-state lawyers may appear *pro hac vice* in state court. This alternative, however, does not allow the nonresident to practice in New Hampshire on the same terms as a resident member of the bar. The lawyer appearing *pro hac vice* must be associated with a local lawyer who is present for trial or argument. See N. H. Sup. Ct. Rule 33(1); N. H. Super. Ct. Rule 19. Furthermore, the decision on whether to grant *pro hac vice* status to an out-of-state lawyer is purely discretionary. See *Leis* v. *Flynt,* 439 U. S. 438, 442 (1979) *(per curiam).*

[3] The District Court did not consider Piper's claims that Rule 42: (i) deprived her of property without due process of law, in violation of the Fourteenth Amendment; (ii) denied her equal protection of the law, in violation of the Fourteenth Amendment; and (iii) placed an undue burden

An evenly divided Court of Appeals for the First Circuit, sitting en banc, affirmed the judgment in favor of Piper. 723 F. 2d 110 (1983).[4] The prevailing judges held that Rule 42 violated the Privileges and Immunities Clause. After finding that Art. IV, § 2, protects an individual's right to "'pursue a livelihood in a State other than his own,'" *id.*, at 112, (quoting *Baldwin* v. *Montana Fish & Game Comm'n, supra*, at 386), the judges applied the two-part test set forth in *Hicklin* v. *Orbeck*, 437 U. S. 518 (1978). They concluded that there was no "substantial reason" for the different treatment of nonresidents and that the challenged discrimination bore no "substantial relationship" to the State's objectives.[5] See *id.*, at 525–527.

The dissenting judges found that the New Hampshire Supreme Court's residency requirement did not violate the Privileges and Immunities Clause. While recognizing that Rule 42 may "serve the less than commendable purpose of insulating New Hampshire practitioners from out-of-state competition," 723 F. 2d, at 119, they found several "substantial" reasons to justify discrimination against nonresidents. If the residency requirement were abolished, "large law firms in distant states" might exert significant influence over the state bar. *Ibid.* These nonresident lawyers would be unfamiliar with local customs and would be less likely to perform *pro bono* work within the State. The dissenting judges

---

upon interstate commerce, in violation of Art. I, § 8, of the United States Constitution. The Court of Appeals did not address these claims, and our resolution of this case makes it unnecessary for us to reach them.

[4] The panel, with one judge dissenting, had reversed the District Court's judgment. 723 F. 2d 98 (1983).

[5] The prevailing judges thought it significant that three State Supreme Courts had invalidated their own bar residency requirements. *Sargus* v. *West Virginia Board of Law Examiners*, —— W. Va. ——, 294 S. E. 2d 440 (1982); *Noll* v. *Alaska Bar Assn.*, 649 P. 2d 241 (Alaska 1982); *Gordon* v. *Committee on Character and Fitness*, 48 N. Y. 2d 266, 397 N. E. 2d 1309 (1979). Since the Court of Appeals decision in this case, another State Supreme Court has reached the same conclusion. *In re Jadd*, 391 Mass. 227, 461 N. E. 2d 760 (1984).

further believed the District Court's judgment was inconsistent with our decision in *Leis* v. *Flynt*, 439 U. S. 438 (1979) *(per curiam)*.

The Supreme Court of New Hampshire filed a timely notice of appeal, and we noted probable jurisdiction. 466 U. S. 949 (1984). We now affirm the judgment of the court below.

## II

### A

Article IV, § 2, of the Constitution provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[6] This Clause was intended to "fuse into one Nation a collection of independent, sovereign States." *Toomer* v. *Witsell*, 334 U. S. 385, 395 (1948). Recognizing this purpose, we have held that it is "[o]nly with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity" that a State must accord residents and nonresidents equal treatment. *Baldwin* v. *Montana Fish & Game Comm'n*, *supra*, at 383. In *Baldwin*, for example, we concluded that a State may charge a nonresident more than it charges a resident for the same elk-hunting license. Because elk hunting is "recreation" rather than a "means of a livelihood," we found that the right to a hunting license was not "fundamental" to the promotion of interstate harmony. 436 U. S., at 388.

Derived, like the Commerce Clause, from the fourth of the Articles of Confederation,[7] the Privileges and Immunities

---

[6] Under this Clause, the terms "citizen" and "resident" are used interchangeably. See *Austin* v. *New Hampshire*, 420 U. S. 656, 662, n. 8 (1975). Under the Fourteenth Amendment, of course, "[a]ll persons born or naturalized in the United States . . . are citizens . . . of the State wherein they reside."

[7] Article IV of the Articles of Confederation provided:

"The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants

Clause was intended to create a national economic union.[8] It is therefore not surprising that this Court repeatedly has found that "one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Toomer* v. *Witsell, supra,* at 396. In *Ward* v. *Maryland,* 12 Wall. 418 (1871), the Court invalidated a statute under which nonresidents were required to pay $300 per year for a license to trade in goods not manufactured in Maryland, while resident traders paid a fee varying from $12 to $150. Similarly, in *Toomer, supra,* the Court held that nonresident fishermen could not be required to pay a license fee of $2,500 for each shrimp boat owned when residents were charged only $25 per boat. Finally, in *Hicklin* v. *Orbeck,* 437 U. S. 518 (1978), we found violative of the Privileges and Immunities Clause a statute containing a resident hiring preference for all employment related to the development of the State's oil and gas resources.[9]

There is nothing in *Ward, Toomer,* or *Hicklin* suggesting that the practice of law should not be viewed as a "privilege"

of each of these States . . . shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof . . . ."

Charles Pinckney, who drafted the Privileges and Immunities Clause, stated that it was "formed exactly upon the principles of the 4th article of the present Confederation." 3 M. Farrand, Records of the Federal Convention of 1787, p. 112 (1911).

[8] This Court has recognized the "mutually reinforcing relationship" between the Commerce Clause and the Privileges and Immunities Clause. *Hicklin* v. *Orbeck,* 437 U. S. 518, 531 (1978).

[9] In *United Building & Construction Trades Council* v. *Mayor & Council of Camden,* 465 U. S. 208 (1984), we stated that "the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause." *Id.,* at 219. We noted that "[m]any, if not most, of our cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity." *Ibid.*

under Art. IV, § 2.[10]   Like the occupations considered in our earlier cases, the practice of law is important to the national economy.   As the Court noted in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 788 (1975), the "activities of lawyers play an important part in commercial intercourse."

The lawyer's role in the national economy is not the only reason that the opportunity to practice law should be considered a "fundamental right."   We believe that the legal profession has a noncommercial role and duty that reinforce the view that the practice of law falls within the ambit of the Privileges and Immunities Clause.[11]   Out-of-state lawyers may—and often do—represent persons who raise unpopular federal claims.   In some cases, representation by nonresident counsel may be the only means available for the vindication of federal rights.   See *Leis* v. *Flynt*, 439 U. S., at 450 (STEVENS, J., dissenting).   The lawyer who champions unpopular causes surely is as important to the "maintenance or well-being of the Union," *Baldwin*, 436 U. S., at 388, as was

---

[10] In *Corfield* v. *Coryell*, 6 F. Cas. 546 (No. 3,230) (CCED Pa. 1825), Justice Bushrod Washington, sitting as Circuit Justice, stated that the "fundamental rights" protected by the Clause included:

"The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal . . . ."   *Id.*, at 552.

Thus in this initial interpretation of the Clause, "professional pursuits," such as the practice of law, were said to be protected.

The "natural rights" theory that underlay *Corfield* was discarded long ago.   *Hague* v. *CIO*, 307 U. S. 496, 511 (1939) (opinion of Roberts, J.); see *Paul* v. *Virginia*, 8 Wall. 168 (1869).   Nevertheless, we have noted that those privileges on Justice Washington's list would still be protected by the Clause.   *Baldwin* v. *Montana Fish & Game Comm'n*, 436 U. S. 371, 387 (1978).

[11] The Court has never held that the Privileges and Immunities Clause protects only economic interests.   See *Doe* v. *Bolton*, 410 U. S. 179 (1973) (Georgia statute permitting only residents to secure abortions found violative of the Privileges and Immunities Clause).

the shrimp fisherman in *Toomer* or the pipeline worker in *Hicklin*.

### B

Appellant asserts that the Privileges and Immunities Clause should be held inapplicable to the practice of law because a lawyer's activities are "bound up with the exercise of judicial power and the administration of justice."[12] Its contention is based on the premise that the lawyer is an "officer of the court," who "exercises state power on a daily basis." Appellant concludes that if the State cannot exclude nonresidents from the bar, its ability to function as a sovereign political body will be threatened.[13]

Lawyers do enjoy a "broad monopoly . . . to do things other citizens may not lawfully do." *In re Griffiths*, 413 U. S. 717, 731 (1973). We do not believe, however, that the practice of law involves an "exercise of state power" justifying New Hampshire's residency requirement. In *In re Griffiths*, *supra*, we held that the State could not exclude an alien from

---

[12] JUSTICE REHNQUIST makes a similar argument in his dissent. He asserts that lawyers, through their adversary representation of clients' interests, "play an important role in the formulation of state policy." *Post*, at 293. He therefore concludes that the residency requirement is necessary to ensure that lawyers are "intimately conversant with the local concerns that should inform such policies." *Ibid.* We believe that this argument, like the one raised by the State, is foreclosed by our reasoning in *In re Griffiths*, 413 U. S. 717 (1973). There, we held that the status of being licensed to practice law does not place a person so close to the core of the political process as to make him a "formulator of government policy." *Id.*, at 729.

[13] We recognize that without certain residency requirements the State "would cease to be the separate political communit[y] that history and the constitutional text make plain w[as] contemplated." Simson, Discrimination Against Nonresidents and the Privileges and Immunities Clause of Article IV, 128 U. Pa. L. Rev. 379, 387 (1979). A State may restrict to its residents, for example, both the right to vote, see *Dunn* v. *Blumstein*, 405 U. S. 330, 343, 344 (1972), and the right to hold state elective office. *Baldwin* v. *Montana Fish & Game Comm'n, supra*, at 383.

the bar on the ground that a lawyer is an "'officer of the Court who' . . . is entrusted with the 'exercise of actual governmental power.'" *Id.*, at 728 (quoting Brief for Appellee in *In re Griffiths*, O. T. 1972, No. 71–1336, p. 5). We concluded that a lawyer is not an "officer" within the ordinary meaning of that word. 413 U. S., at 728. He "'makes his own decisions, follows his own best judgment, collects his own fees and runs his own business.'" *Id.*, at 729 (quoting *Cammer* v. *United States*, 350 U. S. 399, 405 (1956)). Moreover, we held that the state powers entrusted to lawyers do not "involve matters of state policy or acts of such unique responsibility as to entrust them only to citizens." 413 U. S., at 724.[14]

Because, under *Griffiths*, a lawyer is not an "officer" of the State in any political sense,[15] there is no reason for New Hampshire to exclude from its bar nonresidents. We therefore conclude that the right to practice law is protected by the Privileges and Immunities Clause.[16]

---

[14] In *Griffiths*, *supra*, we were concerned with discrimination by a State against aliens. Such discrimination usually is subject to an enhanced level of scrutiny. *Graham* v. *Richardson*, 403 U. S. 365 (1971). The difference between the levels of scrutiny under the Equal Protection Clause and the Privileges and Immunities Clause, however, does not affect the relevance of *Griffiths*. There, we did not subject to "strict scrutiny" the State's argument that the lawyer is "an officer of the court" entrusted with the "exercise of actual governmental power." Instead, we considered this argument only in deciding whether "strict scrutiny" should be applied at all to the challenged classification. 413 U. S., at 727.

[15] It is true that lawyers traditionally have been leaders in state and local affairs—political as well as cultural, religious, and civic. Their training qualifies them for this type of participation. Nevertheless, lawyers are not in any sense officials in the government simply by virtue of being lawyers.

[16] Our conclusion that Rule 42 violates the Privileges and Immunities Clause is consistent with *Leis* v. *Flynt*, 439 U. S. 438 (1979). In *Leis*, we held that a lawyer could be denied, without the benefit of a hearing, permission to appear *pro hac vice*. We concluded that the States should be

## III

The conclusion that Rule 42 deprives nonresidents of a protected privilege does not end our inquiry. The Court has stated that "[l]ike many other constitutional provisions, the privileges and immunities clause is not an absolute." *Toomer* v. *Witsell*, 334 U. S., at 396; see *United Building & Construction Trades Council* v. *Mayor & Council of Camden*, 465 U. S. 208, 222 (1984). The Clause does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective. *Ibid.* In deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means.[17]

---

left free to "prescribe the qualifications for admission to practice and the standards of professional conduct" for those lawyers who appear in its courts. *Id.*, at 442.

Our holding in this case does not interfere with the ability of the States to regulate their bars. The nonresident who seeks to join a bar, unlike the *pro hac vice* applicant, must have the same professional and personal qualifications required of resident lawyers. Furthermore, the nonresident member of the bar is subject to the full force of New Hampshire's disciplinary rules. N. H. Sup. Ct. Rule 37. See n. 23, *infra*.

[17] In *Toomer* v. *Witsell*, 334 U. S. 385 (1948), for example, the Court noted that the State could eliminate the danger of excessive trawling through less restrictive means: restricting the type of equipment used in its fisheries, graduating license fees according to the size of the boats, or charging nonresidents a differential to compensate for the added enforcement burden they imposed. *Id.*, at 398–399.

The dissent asserts that less restrictive means are relevant only to the extent that they indicate that the State "had another, less legitimate goal in mind." Presumably, the only goal that the dissent would view as "illegitimate" would be discrimination for its own sake. We do not believe, however, that the "less restrictive means" analysis has such a limited purpose in the privileges and immunities context. In some cases, the State may be required to achieve its legitimate goals without unnecessarily discriminating against nonresidents.

The Supreme Court of New Hampshire offers several justifications for its refusal to admit nonresidents to the bar. It asserts that nonresident members would be less likely (i) to become, and remain, familiar with local rules and procedures; (ii) to behave ethically; (iii) to be available for court proceedings; and (iv) to do *pro bono* and other volunteer work in the State.[18] We find that none of these reasons meets the test of "substantiality," and that the means chosen do not bear the necessary relationship to the State's objectives.

There is no evidence to support appellant's claim that nonresidents might be less likely to keep abreast of local rules and procedures. Nor may we assume that a nonresident lawyer—any more than a resident—would disserve his clients by failing to familiarize himself with the rules. As a practical matter, we think that unless a lawyer has, or anticipates, a considerable practice in the New Hampshire courts, he would be unlikely to take the bar examination and pay the annual dues of $125.[19]

We also find the appellant's second justification to be without merit, for there is no reason to believe that a nonresident

---

[18] A former president of the American Bar Association has suggested another possible reason for the rule: "Many of the states that have erected fences against out-of-state lawyers have done so primarily to protect their own lawyers from professional competition." Smith, Time for a National Practice of Law Act, 64 A. B. A. J. 557 (1978). This reason is not "substantial." The Privileges and Immunities Clause was designed primarily to prevent such economic protectionism.

[19] Because it is markedly overinclusive, the residency requirement does not bear a substantial relationship to the State's objective. A less restrictive alternative would be to require mandatory attendance at periodic seminars on state practice. There already is a rule requiring all new admittees to complete a "practical skills course" within one year of their admission. N. H. Sup. Ct. Rule 42(7).

New Hampshire's "simple residency" requirement is underinclusive as well, because it permits lawyers who move away from the State to retain their membership in the bar. There is no reason to believe that a former resident would maintain a more active practice in the New Hampshire courts than would a nonresident lawyer who had never lived in the State.

lawyer will conduct his practice in a dishonest manner. The nonresident lawyer's professional duty and interest in his reputation should provide the same incentive to maintain high ethical standards as they do for resident lawyers. A lawyer will be concerned with his reputation in any community where he practices, regardless of where he may live. Furthermore, a nonresident lawyer may be disciplined for unethical conduct. The Supreme Court of New Hampshire has the authority to discipline all members of the bar, regardless of where they reside. See N. H. Sup. Ct. Rule 37.[20]

There is more merit to appellant's assertion that a nonresident member of the bar at times would be unavailable for court proceedings. In the course of litigation, pretrial hearings on various matters often are held on short notice. At times a court will need to confer immediately with counsel. Even the most conscientious lawyer residing in a distant State may find himself unable to appear in court for an unscheduled hearing or proceeding.[21] Nevertheless, we do not believe that this type of problem justifies the exclusion of nonresidents from the state bar. One may assume that a

---

[20] The New Hampshire Bar would be able to discipline a nonresident lawyer in the same manner in which it disciplines resident members. The Supreme Judicial Court of Massachusetts has stated that although there are over 5,000 nonresident members of the Massachusetts Bar, there has been no problem "obtaining jurisdiction over them for bar discipline purposes." *In re Jadd*, 391 Mass., at 234, 461 N. E. 2d, at 765. A committee of the Oregon Bar voiced a similar sentiment: "[W]hy should it be more difficult for the Multnomah County courts to control an attorney from Vancouver, Washington, than from Lakeview, Oregon, if both attorneys are members of the Oregon Bar and subject to its rules and discipline?" Bar Admissions Study Committee, Report to the Supreme Court of Oregon 19 (Jan. 19, 1979).

[21] In many situations, unscheduled hearings may pose only a minimal problem for the nonresident lawyer. Conference telephone calls are being used increasingly as an expeditious means of dispatching pretrial matters. Hanson, Olson, Shuart, & Thornton, Telephone Hearings in Civil Trial Courts: What Do Attorneys Think?, 66 Judicature 408, 408–409 (1983).

high percentage of nonresident lawyers willing to take the state bar examination and pay the annual dues will reside in places reasonably convenient to New Hampshire. Furthermore, in those cases where the nonresident counsel will be unavailable on short notice, the State can protect its interests through less restrictive means. The trial court, by rule or as an exercise of discretion, may require any lawyer who resides at a great distance to retain a local attorney who will be available for unscheduled meetings and hearings.

The final reason advanced by appellant is that nonresident members of the state bar would be disinclined to do their share of *pro bono* and volunteer work. Perhaps this is true to a limited extent, particularly where the member resides in a distant location. We think it is reasonable to believe, however, that most lawyers who become members of a state bar will endeavor to perform their share of these services. This sort of participation, of course, would serve the professional interest of a lawyer who practices in the State. Furthermore, a nonresident bar member, like the resident member, could be required to represent indigents and perhaps to participate in formal legal-aid work.[22]

In summary, appellant neither advances a "substantial reason" for its discrimination against nonresident applicants to the bar,[23] nor demonstrates that the discrimination practiced bears a close relationship to its proffered objectives.

---

[22] The El Paso, Texas, Bar has adopted a mandatory *pro bono* plan, under which each of its members must handle two divorce cases for indigents each year. *Pro Bono Publico:* Federal Legal-Aid Cuts Spur the Bar to Increase Free Work for the Poor, The Wall Street Journal, Mar. 30, 1984, pp. 1, 12.

[23] JUSTICE REHNQUIST suggests another "substantial reason" for the residency requirement: the State's "interest in maximizing the number of resident lawyers, so as to increase the quality of the pool from which its lawmakers can be drawn." *Post*, at 292. Only 8 of the 424 members of New Hampshire's bicameral legislature are lawyers. Statistics compiled by the Clerk of the New Hampshire House of Representatives and the

## IV

We conclude that New Hampshire's bar residency requirement violates the Privileges and Immunities Clause of Art. IV, §2, of the United States Constitution. The nonresident's interest in practicing law is a "privilege" protected by the Clause. Although the lawyer is "an officer of the court," he does not hold a position that can be entrusted only to a "full-fledged member of the political community." A State may discriminate against nonresidents only where its reasons are "substantial," and the difference in treatment bears a close or substantial relation to those reasons. No such showing has been made in this case. Accordingly, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE WHITE, concurring in the result.

Appellee Piper lives only 400 yards from the New Hampshire border. She has passed the New Hampshire bar examination and intends to practice law in New Hampshire. Indeed, insofar as this record reveals, the only law office she will maintain is in New Hampshire. But because she will commute from Vermont rather than reside in New Hampshire, she will not be allowed to practice in the latter State.

I have no doubt that the New Hampshire residency requirement is invalid as applied to appellee Piper. Except for the fact that she will commute from Vermont, she would be indistinguishable from other New Hampshire lawyers. There is every reason to believe that she will be as able as

---

Clerk of the New Hampshire Senate. Moreover, New Hampshire, unlike many other States, see, *e. g.*, Mich. Const., Art. 6, §19, does not prohibit nonlawyers from serving on its Supreme Court, N. H. Rev. Stat. Ann. §490:1 *et seq.* (1983 and Supp. 1983), or its intermediate appellate court, N. H. Rev. Stat. Ann. §491:1 *et seq.* (1983 and Supp. 1983). Therefore, it is not surprising that the dissent's justification for the residency requirement was not raised by appellant or addressed by the courts below.

other New Hampshire lawyers to maintain professional competence, to stay abreast of local rules and procedures, to be available for sudden hearings, and to satisfy any requirements of a member of the New Hampshire bar to perform *pro bono* and volunteer work. It does not appear that her nonresidency presents a special threat to any of the State's interests that is not shared by lawyers living in New Hampshire. Hence, I conclude that the Privileges and Immunities Clause forbids her exclusion from the New Hampshire Bar.

The foregoing is enough to dispose of this case. I do not, and the Court itself need not, reach out to decide the facial validity of the New Hampshire residency requirement. I would postpone to another day such questions as whether the State may constitutionally condition membership in the New Hampshire Bar upon maintaining an office for the practice of law in the State of New Hampshire.

I concur in the judgment invalidating the New Hampshire residency requirement as applied to appellee Piper.

JUSTICE REHNQUIST, dissenting.

Today the Court holds that New Hampshire cannot decide that a New Hampshire lawyer should live in New Hampshire. This may not be surprising to those who view law as just another form of business frequently practiced across state lines by interchangeable actors; the Privileges and Immunities Clause of Art. IV, §2, has long been held to apply to States' attempts to discriminate against nonresidents who seek to ply their trade interstate. The decision will be surprising to many, however, because it so clearly disregards the fact that the practice of law is—almost by definition—fundamentally different from those other occupations that are practiced across state lines without significant deviation from State to State. The fact that each State is free, in a large number of areas, to establish *independently* of the other States its own laws for the governance of its citizens, is

a fundamental precept of our Constitution that, I submit, is of equal stature with the need for the States to form a cohesive union. What is at issue here is New Hampshire's right to decide that those people who in many ways will intimately deal with New Hampshire's self-governance should reside within that State.

The Court's opinion states that the Privileges and Immunities Clause of Art. IV, § 2, "was intended to 'fuse into one Nation a collection of independent, sovereign States.'" *Ante,* at 279 (quoting *Toomer* v. *Witsell,* 334 U. S. 385, 395 (1948)). To this end, we are told, the Clause has been construed to protect the fundamental "privilege" of citizens of one State to do business in another State on terms substantially equal with that State's citizens. This privilege must be protected to effectuate the Clause's purpose to "create a national economic union." *Ante,* at 280. And for the Court, the practice of law is no different from those occupations considered in earlier Privileges and Immunities Clause cases, because "the practice of law is important to the national economy." *Ante,* at 281. After concluding that the Clause applies to lawyers, the Court goes on to reject the many reasons the Supreme Court of New Hampshire advances for limiting the State's lawyers to those who reside in state. The Court either labels these reasons insubstantial, or it advances, with the assurance of an inveterate second-guesser, a "less restrictive means" for the State to attack the perceived problem.

The Framers of our Constitution undoubtedly wished to ensure that the newly created Union did not revert to its component parts because of interstate jealousies and insular tendencies, and it seems clear that the Art. IV Privileges and Immunities Clause was one result of these concerns. But the Framers also created a system of federalism that deliberately allowed for the independent operation of many sovereign States, each with their own laws created by their own legislators and judges. The assumption from the beginning was that the various States' laws need not, and would not,

be the same; the lawmakers of each State might endorse different philosophies and would have to respond to differing interests of their constituents, based on various factors that were of inherently local character. Any student of our Nation's history is well aware of the differing interests of the various States that were represented at Philadelphia; despite the tremendous improvements in transportation and communication that have served to create a more homogeneous country the differences among the various States have hardly disappeared.

It is but a small step from these facts to the recognition that a State has a very strong interest in seeing that its legislators and its judges come from among the constituency of state residents, so that they better understand the local interests to which they will have to respond. The Court does not contest this point; it recognizes that a State may require its lawmakers to be residents without running afoul of the Privileges and Immunities Clause of Art. IV, § 2. See *ante*, at 282, n. 13.

Unlike the Court, I would take the next step, and recognize that the State also has a very "substantial" interest in seeing that its lawyers also are members of that constituency. I begin with two important principles that the Court seems to have forgotton: first, that in reviewing state statutes under this Clause "States should have considerable leeway in analyzing local evils and prescribing appropriate cures," *United Building & Construction Trades Council* v. *Mayor & Council of Camden*, 465 U. S. 208, 223 (1984) (citing *Toomer, supra,* at 396), and second, that regulation of the practice of law generally has been "left exclusively to the States . . . ." *Leis* v. *Flynt*, 439 U. S. 438, 442 (1979) *(per curiam)*. My belief that the practice of law differs from other trades and businesses for Art. IV, § 2, purposes is not based on some notion that law is for some reason a superior profession. The reason that the practice of law should be treated differently is that law is one occupation that does not

readily translate across state lines.[1]  Certain aspects of legal practice are distinctly and intentionally *nonnational;* in this regard one might view this country's legal system as the antithesis of the norms embodied in the Art. IV Privileges and Immunities Clause.  Put simply, the State has a substantial interest in creating its own set of laws responsive to its own local interests, and it is reasonable for a State to decide that those people who have been trained to analyze law and policy are better equipped to write those state laws and adjudicate cases arising under them.  The State therefore may decide that it has an interest in maximizing the number of resident lawyers, so as to increase the quality of the pool from which its lawmakers can be drawn.[2]  A residency law such as the one at issue is the obvious way to accomplish these goals. Since at any given time within a State there is only enough legal work to support a certain number of lawyers, each out-

---

[1] I do not mean to suggest that the practice of law, unlike other occupations, is not a "fundamental" interest subject to the two-step analysis outlined by the Court.  It makes little difference to me which prong of the Court's analysis is implicated, although the thrust of my position is that there are significant state interests justifying this type of interstate discrimination.  Although one might wonder about the logical extensions of the Court's loose language concerning "less restrictive means," see *ante*, at 284–287, the Court's opinion clearly contemplates that some residency requirements concerning trades or businesses will be permissible under the Privileges and Immunities Clause.  I note that New Hampshire's decision with respect to lawyers certainly will not be the only residency requirement for which States could forward substantial reasons, nor will any valid residency requirement necessarily involve only one particular trade or business.  We indicated as much last Term in *United Building & Construction Trades Council* v. *Mayor & Council of Camden,* 465 U. S. 208 (1984).

[2] The Court attempts to rebut this argument with statistics indicating the number of presently practicing lawyers in the New Hampshire Legislature.  *Ante,* at 287–288, n. 23.  While I am not convinced of the usefulness of these statistics, I note in any event that the Court neglects to point out that only 6 of the 124 judges presently sitting in New Hampshire courts are nonlawyers, and that only 12 of the 89 Supreme Court Justices in the State's history have been nonlawyers.

of-state lawyer who is allowed to practice necessarily takes legal work that could support an in-state lawyer, who would otherwise be available to perform various functions that a State has an interest in promoting.[3]

Nor does the State's interest end with enlarging the pool of qualified lawmakers. A State similarly might determine that because lawyers play an important role in the formulation of state policy through their adversary representation, they should be intimately conversant with the local concerns that should inform such policies. And the State likewise might conclude that those citizens trained in the law are likely to bring their useful expertise to other important functions that benefit from such expertise and are of interest to state governments—such as trusteeships, or directorships of corporations or charitable organizations, or school board positions, or merely the role of the interested citizen at a town meeting. Thus, although the Court suggests that state bars can require out-of-state members to "represent indigents and perhaps to participate in formal legal-aid work," *ante*, at 287, the Court ignores a host of other important functions that a State could find would likely be performed only by in-state bar members. States may find a substantial interest in members of their bar being residents, and this insular interest—as with the opposing interest in interstate harmony represented by Art. IV, § 2—itself has its genesis in the language and structure of the Constitution.[4]

---

[3] In New Hampshire's case, lawyers living 40 miles from the state border in Boston could easily devote part of their practice to New Hampshire clients. If this occurred a significant amount of New Hampshire legal work might wind up in Boston, along with lawyers who might otherwise reside in New Hampshire.

[4] I do not find the analysis of *In re Griffiths*, 413 U. S. 717 (1973), to be controlling here. *Griffiths* dealt with an Equal Protection Clause challenge to a state bar admission rule that excluded aliens. In the course of striking down that restriction this Court held that lawyers should not be considered "officers of the court" in the sense that they actually wield state powers. *Id.*, at 727–729. Whatever the merits of that conclusion, my

It is no answer to these arguments that many lawyers simply will not perform these functions, or that out-of-state lawyers can perform them equally well, or that the State can devise less restrictive alternatives for accomplishing these goals. Conclusory second-guessing of difficult legislative decisions, such as the Court resorts to today, is not an attractive way for federal courts to engage in judicial review. Thus, whatever the reality of how much New Hampshire can expect to gain from having the members of its bar reside within that State, the point is that New Hampshire is entitled to believe and hope that its lawyers will provide the various unique services mentioned above, just as it is entitled to believe that the residency requirement is the appropriate way to that end. As noted, some of these services can *only* be provided by lawyers who also are residents. With respect to the other services, the State can reasonably find that lawyers who reside in state are more likely to undertake them.

In addition, I find the Court's "less restrictive means" analysis both ill-advised and potentially unmanageable. Initially I would note, as I and other Members of this Court have before, see *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 599–600 (1980) (REHNQUIST, J., dissenting) (citing *Illinois Elections Bd.* v. *Socialist Workers Party*, 440 U. S. 173, 188–189 (1979) (BLACKMUN, J., concurring)); cf. *Florida* v. *Royer*, 460 U. S. 491, 528–529 (1983) (REHNQUIST, J., dissenting), that such an analysis, when carried too far, will ultimately lead to striking

point here is different; whether or not lawyers actually wield state powers, the State nevertheless has a substantial interest in having resident lawyers. In *Griffiths* the alien lawyers were state residents. The harms that a State can identify from allowing *nonresident* lawyers to practice are very different from the harms posited in *Griffiths* as arising from allowing *resident alien* lawyers to practice. I note in addition that the standards established for reviewing alienage classifications under the Equal Protection Clause are not equated with the standard of review under the Art. IV Privileges and Immunities Clause.

down almost any statute on the ground that the Court could think of another "less restrictive" way to write it. This approach to judicial review, far more than the usual application of a standard of review, tends to place courts in the position of second-guessing legislators on legislative matters. Surely this is not a consequence to be desired.

In any event, I find the less-restrictive-means analysis, which is borrowed from our First Amendment jurisprudence, to be out of place in the context of the Art. IV Privileges and Immunities Clause. *Toomer* v. *Witsell*, 334 U. S., at 396, and *Hicklin* v. *Orbeck*, 437 U. S. 518, 529–530 (1978), indicate that the means employed by the State should bear a "substantial" or "close relation" to the State's objectives, and they speak in terms of whether the State's approach is "tailored" to its stated goal. This approach perhaps has a place: to the extent that an obvious way to accomplish the State's proffered goal is apparent, the fact that the State did not follow that path may indicate that the State had another, less legitimate goal in mind. But I believe the challenge of a "less restrictive means" should be overcome if merely a legitimate reason exists for not pursuing that path. And in any event courts should not play the game that the Court has played here—independently scrutinizing each asserted state interest to see if it could devise a better way than the State to accomplish that goal. Here the appellee primarily argues that if the State really was concerned about out-of-state lawyers it would not allow those who leave the State after joining the bar to remain members. The answer to this argument was well stated by the dissenting judges in the Court of Appeals for the First Circuit: "[T]he Supreme Court of New Hampshire might have concluded that not many New Hampshire lawyers will both pull up stakes and continue to practice in the state. And it might further believe that the bureaucracy required to keep track of such comings and goings would not be worth the trouble . . . ." 723 F. 2d 110, 122, n. 4 (1983) (opinion of Campbell, C. J., and Breyer, J.).

There is yet another interest asserted by the State that I believe would justify a decision to limit membership in the state bar to state residents. The State argues that out-of-state bar members pose a problem in situations where counsel must be available on short notice to represent clients on unscheduled matters. The Court brushes this argument aside, speculating that "a high percentage of nonresident lawyers willing to take the state bar examination and pay the annual dues will reside in places reasonably convenient to New Hampshire," and suggesting that in any event the trial court could alleviate this problem by requiring the lawyer to retain local counsel. *Ante,* at 286–287. Assuming that the latter suggestion does not itself constitute unlawful discrimination under the Court's test, there nevertheless may be good reasons why a State or a trial court would rather not get into structuring attorney-client relationships by requiring the retention of local counsel for emergency matters. The situation would have to be explained to the client, and the allocation of responsibility between resident and nonresident counsel could cause as many problems as the Court's suggestion might cure.

Nor do I believe that the problem can be confined to emergency matters. The Court admits that even in the ordinary course of litigation a trial judge will want trial lawyers to be available on short notice; the uncertainties of managing a trial docket are such that lawyers rarely are given a single date on which a trial will begin; they may be required to "stand by"—or whatever the local terminology is—for days at a time, and then be expected to be ready in a matter of hours, with witnesses, when the case in front of them suddenly settles. A State reasonably can decide that a trial court should not have added to its present scheduling difficulties the uncertainties and added delays fostered by counsel who might reside 1,000 miles from New Hampshire. If there is any single problem with state legal systems that this Court might consider "substantial," it is the problem of delay

in litigation—a subject that has been profusely explored in the literature over the past several years. See, *e. g.*, Attacking Litigation Costs and Delay, Final Report of the Action Commission to Reduce Court Costs and Delay (American Bar Association 1984); S. Wasby, T. Marvell, & A. Aikman, Volume and Delay in State Appellate Courts: Problems and Responses (1979). Surely the State has a substantial interest in taking steps to minimize this problem. Thus, I think that New Hampshire had more than enough "substantial reasons" to conclude that its lawyers should also be its residents. I would hold that the Rule of the New Hampshire Supreme Court does not violate the Privileges and Immunities Clause of Art. IV.