IN RE JULY 1986 OHIO BAR EXAMINATION APPLICANT NO. 719.

IN RE JULY 1986 OHIO BAR EXAMINATION APPLICANT NO. 1327.

[Cite as *In re July 1986 Ohio Bar Examination Applicant No. 719* (1991), 61 Ohio St.3d 307.]

(Nos. 91–1004 and 91–1005—Submitted June 26, 1991—Decided July 10, 1991.)

*Chester, Hoffman, Willcox & Saxbe, John J. Chester* and *Richard C. Addison,* for respondent in case No. 91–1004.

*Richard D. Goldberg,* for respondent in case No. 91–1005.

ALICE ROBIE RESNICK, J.   In 1986, an applicant had to receive at least 270 points on the Ohio bar examination in order to pass.   However, if an applicant scored in the upper 60th percentile on the Multistate Bar Examination ("MBE"), only two of his or her twelve essay booklets (two questions per booklet), selected at random, were graded.   If the applicant received at least 14 points on each booklet, he or she was afforded a presumption of passing the bar examination and no other essay questions were graded.   The total examination grade for those persons who received a presumption of passing was calculated by multiplying the MBE weighted score by three.   All essay booklets were graded for applicants who did not score in the upper 60th percentile on the MBE.   All essay booklets were also graded for applicants who scored in the upper 60th percentile on the MBE but who achieved fewer than 14 points on one or both of the randomly selected essay booklets.   For these applicants, the total bar examination score was calculated by adding the MBE weighted score with the total of the essay booklet scores.

Applicant 719 scored in the 23.7th percentile on the MBE.   In other words, only 23.7 percent of the other Ohio bar examination applicants obtained MBE scores lower than that of Applicant 719.   Because Applicant 719 was not in the upper 60th percentile on the MBE, all of her essay booklets should have been graded.   However, her applicant number was incorrectly placed on the list of applicants who scored in the upper 60th percentile on the MBE, and it was incorrectly omitted from the list of applicants who scored in the lower 40th percentile.   Furthermore, an incorrect MBE weighted score was recorded on the Master Grade Sheet for Applicant 719, giving her credit for a higher

score than she actually earned. As a result of the above, Applicant 719 was treated as though she had scored in the upper 60th percentile on the MBE, and only two of her essay booklets were graded. She received a 15 and a 16 on these two essay booklets and was thus passed automatically. Her total examination score was calculated by multiplying the incorrectly recorded MBE weighted score by three.

Applicant 1327 scored in the 33.4th percentile on the MBE; only 33.4 percent of other Ohio bar examination applicants obtained MBE scores lower than his score. Because he did not score in the upper 60th percentile on the MBE, he, too, should have had all of his essay booklets graded. However, as with Applicant 719, Applicant 1327 was treated as though he had scored in the upper 60th percentile on the MBE. His applicant number was incorrectly placed on the upper 60th percentile list and was omitted from the lower 40th percentile list. An incorrect MBE weighted score was then recorded on the Master Grade Sheet for Applicant 1327, giving him credit for a higher MBE score than he actually earned. Only two of his essay booklets were graded. He received a 16.5 and an 18 on these, and he was passed automatically. His total examination score was calculated by multiplying the incorrectly recorded MBE weighted score by three.

In each instance the applicants' essay booklets have been destroyed at unknown times and by unknown court employees. As a result there is no way to return to the essay booklets of either Applicant 719 or 1327 to grade all of the essay booklets in order to determine whether in fact a passing score would have been earned. The converse is also true: there is no existing evidence indicating that if all of the essay booklets were graded, the applicants would have failed the 1986 Ohio bar examination. Thus, it is impossible for either of the applicants to demonstrate with certainty that he or she passed the examination, nor is it possible for the court to demonstrate that either applicant failed the examination since the test booklets have been destroyed.

The irregularities which led to the suspension of Applicants 719 and 1327 were first discovered and made known to this court by a court employee in April 1989. The court initially inquired into the cause and then referred the matter to the Franklin County Prosecutor's Office for investigation. The matter was ultimately investigated by a special prosecutor and presented to the Franklin County Grand Jury. As a result, the grand jury returned no indictments. It determined there had been tampering with the examination records but found no evidence establishing that Applicants 719 and 1327 had any knowledge of or participated in any manner in the tampering. However, it is the duty of this court to determine if there is sufficient evidence which would establish with substantial certainty that Applicants 719 and 1327 did

not, in fact, earn a passing score on the 1986 Ohio bar examination thus requiring them to retake the Ohio bar examination.

The practice of law is a right which is protected by the Constitutions of the United States and the state of Ohio. It is a right which the United States Supreme Court has deemed fundamental. See *Supreme Court of New Hampshire v. Piper* (1985), 470 U.S. 274, 281, 105 S.Ct. 1272, 1277, 84 L.E.2d 205, 211. The United States Court of Appeals for the District of Columbia in *Laughlin v. Wheat* (1937), 95 F.2d 101, 102, quoting from *McMurchie v. Superior Court of Yavapai Cty.* (1923), 26 Ariz. 52, 56, 221 P. 549, 550–551, noted:

" 'The license which an attorney holds to practice his profession is not a mere indulgence, revocable at the pleasure of the court, but it is a right with which he has been invested, to hold during good behavior, and cannot be lightly or capriciously taken from him. It is acquired by order and judgment of a court, after examination into his moral and intellectual qualifications. He can only be divested of that right by a like judgment of court, entered after due notice and inquiry and opportunity to be heard, and based upon some conduct on his part which makes him unworthy to further engage in the practice of law.' "

In the cases before us no wrongdoing on the part of either applicant has been revealed. Additionally, both applicants scored relatively high on the two essay booklets which were graded. Recently, we have had Stephen P. Klein, Ph.D., study and review the Ohio bar examination. Dr. Klein noted in a report entitled "Statistical Analysis of the Ohio Bar Examination" that: "In general, the candidates who received high scores on one essay question tended to receive high scores on the other 23 questions.* * * " Additionally, Dr. Klein concluded that: "1) It is usually much easier to pass the Ohio bar exam than it is to pass the exams in most other jurisdictions. * * * 5) There is a high correlation between MBE and Ohio essay scores; i.e., candidates who earn relatively high scores on one part of the exam also tend to earn high scores on the other part."

Both of these applicants did in fact receive relatively high scores on the two essay booklets which were graded. Hence according to Dr. Klein they would "also tend to receive high scores" on the remaining test booklets. The pass rate for the July 1986 exam was 85.3%. Thus, only 14.7% of the applicants who took that exam failed it. Both Applicant 719 and Applicant 1327 scored above the 14.7th percentile on the MBE. Because of the high correlation between MBE and essay scores, we may assume they would have scored well on the essay portion of the exam, and would have passed the entire exam.

There is no evidence which tends to establish that either applicant had knowledge of or participated in the score changes. These applicants have engaged in the practice of law for nearly five years and have not been involved in any type of disciplinary action. Due to the destruction of the test booklets in question, there remains no way to determine whether in fact these applicants failed the examination. Lastly, one of the applicants has been admitted to the bar of another state by examination.

In sum, the practice of law is a fundamental right which cannot be lightly withdrawn. In both of these cases irregularities have in fact occurred relating to the MBE test score. Both of these applicants were given the presumption of passing the 1986 Ohio bar examination after only two essay booklets were graded. Based upon this evidence, to require these applicants to take another bar examination after nearly five years of exemplary practice of the law would be unjust and inequitable. As soon as the tampering was brought to the attention of the Chief Justice and Justices of this court a full-scale independent investigation was conducted. No indictments were returned. Since the booklets have been destroyed by court employees and we cannot determine with exactitude whether Applicants 719 and 1327, in fact, did not pass the bar examination, we shall continue to maintain the presumption accorded them in 1986. We will not withdraw from these applicants the privilege to practice law in the state of Ohio since it has not been shown that it was the personal conduct of these individual applicants that caused this situation to arise.

The prior suspension of this court from the practice of law of Applicants 719 and 1327 is hereby withdrawn. Applicants 719 and 1327 are hereby reinstated to the practice of law in the state of Ohio.

*Suspensions withdrawn.*

SWEENEY and DOUGLAS, JJ., concur.

HOLMES and H. BROWN, JJ., concur separately.

MOYER, C.J., and WRIGHT, J., separately dissent.

SWEENEY, J., concurring. I concur in the well-reasoned and exemplary analysis undertaken by Justice Resnick in the majority opinion. The fact that some bar exam results were tampered with is, unfortunately, well documented. Nevertheless, the fate of the instant applicants should not, in turn, be tampered with in order to right any and all wrongs that occurred in the grading of the 1986 bar exam. Contrary to some assertions in the dissenting opinions, the faith of the public in the integrity of the bar examination process is not undermined by removing the suspensions previously levied by this court

in these particular cases. The fact remains that *this court* granted law licenses to these individuals, and it was *this court* that chose to destroy the evidence that would otherwise permit these applicants the demonstrable opportunity to prove the worthiness of their passing scores on the 1986 bar exam.

In my view, the evidence that does remain indicates strongly that these individuals did in fact pass the bar exam. To hold these individuals up as "scapegoats" in order to close the book on any irregularities that took place in the grading of the 1986 bar exam is not only unfair, but much too convenient to be sanctioned by a body that seeks justice in all its deliberations. The fact remains that these individuals had absolutely no involvement in the changing of their bar exam grades.

Clearly, this court acted hastily in suspending these applicants in its original decision of May 17, 1991. Fortunately, the majority of this court has the judicial courage to admit its mistake and correct the same.

HOLMES, J., concurring. The determination of a just and reasonable result in these bar examination cases has been, as noted by the majority and dissenting opinions, a most perplexing encounter. One can honestly come down on either side of the issues presented; however, when all factors are weighed in perspective, I must join those who have concluded that Applicant No. 719 and Applicant No. 1327 may continue in the practice of law without retaking the Ohio bar examination.

First, I realize that it is the duty of this court to protect the integrity of the bar examination system in Ohio and, in doing so, remain conscious of the need to apply the rules uniformly and fairly among the examinees, and also to be conscious of the need to serve the public interests in these matters.

My conclusion is primarily based upon a review of the technical data presented on the probabilities of both applicants passing the July 1986 bar exam had all of their essays been graded, an extrapolation of their scores on the essays that were graded, and a consideration of their scores on the MBE portion of the bar exam. Additionally, I have considered the factor that there has not been the slightest suggestion that either of these applicants was involved in, or was aware of, any unauthorized changes in their bar exam grades, and I have reviewed the evidence relating to their professional performance since being admitted.

Applicant No. 719's actual weighted score in the MBE was 91; the essay scores for the two books, each containing two essays, were 15 and 16. Therefore, this applicant received an average passing score of 7.75 of a possible 10 on each of the four essays that were graded. Stephen P. Klein,

Ph.D., who conducted the statistical analysis of the Ohio bar examination, stated in his report that: "In general, the candidates who received high scores on one essay question tended to receive high scores on the other 23 questions." Accordingly, assuming that Applicant No. 719 performed as well on the essays that were not graded as this applicant did on the four that were, an average of 7.75 out of 10, this applicant would have received 186 points on the essay portion of the 1986 examination. Adding this to applicant's MBE score of 91 would result in a score of 277, which would be in excess of the 270 points required for passage of the exam.

As to Applicant No. 1327, the actual weighted score of the MBE exam was 92. The scores of the two booklets graded were 16.5 and 18, or an average of 8.63 out of a possible 10, or 207.12 points on the essay questions. Adding this to Applicant No. 1327's actual weighted score of 92 would result in a score of 299.12, which would be in excess of the 270 points needed for passing.

In support of Applicant No. 719's motion for reconsideration here, a statistical analysis of the applicant's bar exam performance was submitted by James A. Deddens, Ph.D. In addition, an expert opinion by Harvey S. Rosen, Ph.D., was presented by affidavit. The experts respectively concluded that it was "very likely" or "highly probable" that Applicant No. 719 would have passed the July 1986 Ohio bar examination if all of her essays had been graded.

It is recognized that the conclusions of these experts, as well as my conclusions, are all hypothetical in nature, in that we do not have the actual essay books to be graded. It is also recognized that it is possible to set forth figures to support any hypothesis. However, in the totality of the circumstances of the matters before us, I conclude that the hypothesis adopted here is a reasonable one in that we are unable to disprove it since court procedures have unfortunately destroyed the essay exam books and in like manner any means of disproving the hypothesis.

Additionally, I believe it to be fair that consideration be given to the absence of fault upon the part of the applicants and to their interim standard of practice in the profession which would tend to confirm the goal of the Ohio bar exam which is to determine the fitness of the applicant to practice law. Thus, I conclude that this goal has been met and, therefore, the applicants' suspensions should be withdrawn.

DOUGLAS, J., concurring. Because Justice Resnick's well-reasoned majority opinion now comports with my original vote in these cases (see 60 Ohio St.3d 605, 606, 573 N.E.2d 593, 594, and 60 Ohio St.3d 606, 608, 573 N.E.2d 38, 39), I concur. It is fair, however, to point out that *all* the pertinent evidence and law now available to the court in both of these cases were available to us at

the time the court made its original judgment in these matters and it is, at the very least, unfortunate that these two lawyers have been put through that which they have been required to endure.

HERBERT R. BROWN, J., concurring. This is one of the most troubling and difficult decisions that I have been required to face as a member of this court.

It is clear that the scores of both applicants (numbers 719 and 1327) were deliberately changed to benefit the applicants. Because of the alteration, each of these applicants had only two examination booklets (four answers) graded when, under the rule, all booklets (twenty-four answers) should have been graded.

I accept the assertion that these beneficiaries of this wrongful grade alteration neither knew of nor participated in the misdeed. No evidence has been brought to us to warrant making any other assumption.

Under the circumstances, the fair and correct remedy would have been to grade all the answers submitted by each applicant and to pass or fail each applicant by the same standard applied to every other similarly situated taker of the 1986 Ohio bar examination. Unfortunately, this is not possible. Sometime in 1987 (the exact date being unknown), the examination booklets for the July 1986 bar examination were destroyed. This destruction, I am satisfied, was routinely done. That action carries no taint of wrongdoing.

The problem then is this: Applicants who did everything required of them and whose grades were changed without their knowledge or complicity cannot have all of their examination answers graded because action taken by the court makes that impossible. In this situation I believe we, the court, bear a corporate or institutional responsibility for the destruction (albeit innocent) of the examination answers.

Having come to that conclusion, I turn to the evidence which remains before us concerning the performance of Applicants Nos. 719 and 1327 on the July 1986 Ohio bar examination.

Applicant No. 719 received scores of 15 and 16 on the two booklets which were graded. The applicant's average score on these four questions was 7.75, above the pass standard of 7.5. On the Multistate Bar Examination ("MBE"), this applicant achieved a total which, when properly weighted, gave the applicant a score of 91. Of the 270 points required to pass the Ohio bar examination, one third (or 90 points) was allocated to the MBE. Thus, this applicant received scores on both portions of the bar exam which exceeded the grade required to pass. This applicant earned a passing grade on all material that is available to be graded and the strong probability (the evidence

suggests odds of greater than 7 to 1) is that the applicant would have passed the entire exam if it could be graded.

Applicant No. 1327 received scores of 16.5 and 18 on the two booklets which were graded. The applicant's average score on these four questions was 8.63, above the pass standard of 7.5. On the MBE, this applicant achieved a total which, when properly weighted, gave the applicant a score of 92. Of the 270 points required to pass the Ohio bar examination, one third (or 90 points) was allocated to the MBE. Thus, this applicant received scores on both portions of the bar exam which exceeded the grade required to pass. This applicant earned a passing grade on all material that is available to be graded and the overwhelming probability is that the applicant would have passed the entire exam if it could be graded.

The case before us is difficult for me because there is a slight chance that each of these applicants might have failed the examination if all answers had been graded. I am painfully sensitive to those (if there are any) who might have failed the 1986 Ohio bar examination and who scored as well as these two applicants on the portions of the exam which were graded. Further, the integrity of the bar examination is of the highest concern. I abhor the actions that were taken in the altering of grades.

In the final analysis, however, we must be fair with and do justice to the applicants who are before us in this case. We do not punish those who altered the scores by punishing these applicants. In a very real sense these applicants have also been the victims of the action done in changing their grades. Since the evidence strongly suggests that Applicant No. 719 and Applicant No. 1327 passed the July 1986 Ohio bar examination; since the only means of questioning that conclusion has been rendered impossible by the court; since the grade alteration itself appears to have been done by an agent, or agents of the court; and since the assumption must be made that Applicants Nos. 719 and 1327 were innocent and ignorant concerning the wrongdoing, I must change my earlier vote. I have concluded that no action should be taken which jeopardizes the standing of these two applicants as duly registered members of the bar of Ohio.

MOYER, C.J., dissenting. I respectfully dissent, because the majority opinion fails to address the very difficult issue presented.

Several important facts have not been included in the majority opinion and will therefore be stated here.

1. On May 7, 1991, the court and the public were informed by the Franklin County Special Prosecutor that the Franklin County Grand Jury had concluded that illegal conduct had produced passing grades for certain examinees in the February and July 1986 Ohio bar examinations. We were also informed

at that time that since more than one person was possibly involved in the alteration of test scores, no indictments were forthcoming. The majority opinion refers to that conduct merely as "tampering with the examination records." Such a characterization is hardly an adequate description of blatant criminal conduct that represents an attack upon one of the most important constitutional responsibilities of the Supreme Court of Ohio.

2. Although there was no evidence that respondents participated in or knew that their bar examination scores were a product of illegal conduct, it is significant that they were closely associated with the court when that conduct occurred.

3. On May 17, 1991, a majority of the court suspended respondents from the further practice of law. The suspension was stayed pending respondents' decision to take a portion or all of the 1991 bar examination. Respondents were given the option of retaining their actual MBE scores from the 1986 bar examination and retaking only the written portion of the July 1991 bar examination.

The court's May 17 decision reflected the concern of the majority at that time, for both the integrity of the Ohio bar examination and the very unusual circumstances in which respondents had been placed.

4. The destruction of the 1986 essay booklets within a year after the examination was administered occurred pursuant to a longstanding practice of the court. It was not related to the illegal conduct of court personnel in 1986.

We are presented with a choice that no court should be required to make. There is no compelling legal precedent that can be neatly applied to the facts before us. Thus, we are called upon to exercise the most valuable and precious of our resources—our judgment.

The majority opinion is founded on the premise that respondents completed the bar examination as required; that the court certified their admission to the bar; that respondents were not aware that their bar examinations had been scored in contravention of the scoring procedure for the Ohio bar examination then in effect; that court personnel disposed of the essay exams, which, if available, would enable us to determine respondents' actual scores; and that it would be unfair to require respondents to complete the bar examination. That premise would be most persuasive if our only concern were the inconvenience, and indeed hardship, imposed upon respondents. I believe our responsibility requires us to consider more.

The premise of our original decision was that applicants to the Bar of Ohio and the public at large must believe that the Ohio bar examination fairly tests the minimum skills of those whom the court certifies as lawyers of this state

and as officers of the court. We believed that every bar applicant must be graded and scored by the same standard. That is the issue before us. The fact that there is no evidence of respondents' knowledge of the favored treatment they received is relevant only to determine whether respondents should be given the privilege of being members of the Bar of Ohio. I assume that if there was probative evidence of such conduct on the part of respondents, we would certainly not be offering them the opportunity to complete the bar examination and to maintain their status as members of the Bar of this state.

In 1928 this court disposed of a matter in which several applicants themselves were culpable in changing bar examination grades. *State, ex rel. Turner, v. Albin* (1928), 118 Ohio St. 527, 161 N.E. 792. Although distinguishable on its facts, the case is important for the court's observation with respect to the issue before us. The court said:

"Unless the purity of the processes of selecting attorneys can be preserved, the usefulness, if not the very existence, of the court is threatened." *Id.* at 534, 161 N.E. at 794.

It would be an overstatement to urge that the majority's disposition of the matters before us threatened the "usefulness" of the court, but it can certainly be suggested that it does threaten the perception of the court as an institution that applies one standard to all people who come before it.

What answer does the majority opinion give to those 1986 bar examinees who were similarly situated with respondents, whose exams were scored according to the rules and who did not pass the bar examination? The November 14, 1990 Statistical Analysis of The Ohio Bar Examination, prepared for the court by Stephen P. Klein, Ph.D., and attached to a respondent's brief, demonstrates that such a question is not hypothetical. Dr. Klein observed that based on a random sample of all examinations in the July 1990 bar examination, the 60–40 rule (referred to in his report as the "supplemental rule") "passed a significant percentage of applicants who would have failed if all of their answers had been graded." Applying Dr. Klein's findings to the issue before us, it is clear that respondents received a significant benefit when their total scores were improperly based upon respondents' answers to four rather than twenty-four essay questions. It was a benefit that certainly would have changed the fate of some other examinees in 1986 if it had been given to them.

What would we do if fire or some other unintended calamity destroyed the bar examination booklets before they were graded? The rationale of the majority opinion suggests that since the bar examinees were not at fault we would admit them all to the Bar of Ohio regardless of their competence. Are

respondents not in a position similar to the runner who sets a new record for the high hurdles, only to learn later that a friendly official had lowered the hurdle in his lane to make it easier for him to win the race? The rationale of the majority opinion would suggest that the runner's time would not be removed from the record book even though the rules of the race were changed for him.

My fear is that our action here will be perceived as the action of judges and lawyers setting a standard for themselves that common sense and basic fairness would apply to no one else.

Our judgment in this matter should be an unequivocal statement—a reaffirmation—that all applicants to the Bar of Ohio, without exception, are administered the same examination and scored by the same standards and rules as are all other applicants. Because our decision of May 17 reaffirmed that principle, I would overrule the motion for reconsideration.

WRIGHT, J., concurs in the foregoing dissenting opinion.

WRIGHT, J., dissenting. I concur in the Chief Justice's dissent. I write separately not to criticize the majority opinion—the typical role of one in dissent—but to express a genuine degree of anguish over this controversy. To posit that this is a difficult call is a gross understatement.

On one hand we observe two young lawyers five years in the practice and doing well. There is some indication that simple fairness would require us to lift their suspensions and close the book on this unhappy affair.

On the other hand, we find two individuals who held a fiduciary relationship with the court at the time the misconduct noted above took place. Some person or persons with a similar relationship saw fit to alter the scoring of these two exams and otherwise tampered with the system. I think it a fair inference that but for the applicants' relationship to the court no such alteration would have occurred and the grading process would have gone its course for good or for ill. The simple fact is that no one knows whether these two young persons actually passed the exam. Further, it would appear that we do an injustice to hundreds of similarly situated individuals whose whole work was graded and failed to pass muster by anywhere from three points to one-half point.

There is no single measure of justice here. Rather, there is a mix of truths that appear to contradict one another. Viewing the matter with an eye toward maintaining confidence in the integrity of the process, I conclude that these individuals should be required to take and pass the next regularly scheduled bar exam.