**David C. FRAZIER, Plaintiff-Appellant,**

v.

**Honorable Frederick J.R. HEEBE, et al., Defendants-Appellees.**

No. 84–3706.

United States Court of Appeals, Fifth Circuit.

April 24, 1986.

Rehearing and Rehearing En Banc Denied June 25, 1986.

---

Goldberg, Circuit Judge, filed dissenting opinion.

Cornish F. Hitchcock, Public Citizen Lit. Group, Washington, D.C., Gregg L. Spyridon, Lafayette, La., Gary L. Roberts, Pascagoula, Miss., for plaintiff-appellant.

Curtis R. Boisfontaine, Cicero C. Sessions, Sally A. Shushan, New Orleans, La., for defendants-appellees.

Before GOLDBERG, POLITZ, and JOLLY, Circuit Judges.

POLITZ, Circuit Judge:

We are asked to review the rules regulating the admission of lawyers to the bar of the Eastern District of Louisiana. David C. Frazier appeals a judgment denying his petition for admission to the bar of that court. We affirm.

## BACKGROUND

Frazier, a member in good standing of the bars of Louisiana [1] and Mississippi, resides and has his law office in Pascagoula, Mississippi. He is admitted to practice before the United States District Court for the Southern District of Mississippi, the United States Court of Appeals for the Eleventh Circuit, and this court. In April 1982, Frazier applied for admission to the bar of the Eastern District, candidly noting in his cover letter that he neither resided nor maintained an office in Louisiana as required by Rule 21.2 of the Eastern District's local rules.[2] Frazier's application was denied solely because of this fact.[3]

Frazier sought a writ of prohibition from this court. We remanded the case for entry of an appealable judgment and ordered that the petition for extraordinary relief be carried with the case. *In re Frazier,* No. 83–3015, unpublished order (Feb. 14, 1983). On remand, Frazier filed a complaint alleging that Eastern District Rules 21.2 and 23.3.1 [4] were unconstitutional both on their

1. The fact that Frazier is admitted to practice in Louisiana distinguishes this case from *Matter of Roberts,* 682 F.2d 105 (3d Cir.1982).

2. Rule 21.2 of the local rules of the Eastern District provides:

Any member in good standing of the bar of the Supreme Court of Louisiana who resides or maintains an office for the practice of law in the State of Louisiana is eligible for admission to the bar of this court.

3. There is no dispute that Frazier meets all of the other requirements for admission in the Eastern District.

4. Rule 23.3.1 of the local rules of the Eastern District, promulgated after Frazier had sought a writ of prohibition, enforces the goals of Rule 21.2. Rule 23.3.1 provides:

In order to continue as a member of the bar of this Court, an attorney must continuously and without interruption reside or maintain an office for the practice of law in the State of Louisiana.

An attorney admitted to practice before this Court, but who does not continuously qualify as set out herein, shall notify the Court within 30 days following termination of his qualifications that he desires to withdraw from the practice in this Court or that he desires a hearing to show cause why he should be permitted to continue to practice, though not qualified under the residence or office requirements of the rules.

An attorney who is not qualified to practice before this Court on the effective date of this rule (as amended), having previously failed to maintain the residence or office requirement of the rule, shall be allowed 90 days within which to notify the Court of his election to withdraw from practice in this Court or to request a hearing as described above.

At the time an attorney files the annual statement pursuant to the Rules of Disciplinary Enforcement of this Court, if the attorney has changed his residence or office address since the time of filing the previous annual statement, he shall certify that he is

face and as applied, being in contravention of the commerce clause, the full faith and credit clause, the privileges and immunities clause of Article IV, the first amendment, and the equal protection component of the fifth amendment due process clause. The case was tried to Senior District Judge Edwin F. Hunter of the Western District of Louisiana, sitting by special designation. After a bench trial, Judge Hunter denied Frazier's petition for extraordinary relief and dismissed his suit. The reasons and reasoning assigned are comprehensive and scholarly. *Matter of Frazier*, 594 F.Supp. 1173 (E.D.La.1984).

On appeal, Frazier urges only the equal protection and privileges and immunities claims. If we find the challenged rules constitutional, he alternatively asks that we exercise our supervisory jurisdiction over the district courts of this circuit and order his admission.

## ANALYSIS

Frazier's constitutional attack is dual: the challenged rules abrogate his privileges and immunities as a citizen, and they violate the equal protection clause.

*Privileges and Immunities*

■ The privileges and immunities clause, Art. IV, § 2, cl. 1, limits the powers of a state to accord the fundamental rights of a citizen of another state a treatment different than that given its own citizens. *See, e.g., Supreme Court of New Hampshire v. Piper,* —— U.S. ——, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985); *Toomer v. Witsell,* 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). This clause does not apply to the federal government and its officers.

Frazier maintains that in the interest of promoting interstate harmony the clause ought to be made applicable through the due process clause of the fifth amendment to rules adopted by local federal courts. We are not persuaded.

■ Federal judges are empowered to promulgate local rules of court, 28 U.S.C.

§§ 1654 & 2071; Fed.R.Civ.P. 83; *United States v. Hvass,* 355 U.S. 570, 78 S.Ct. 501, 2 L.Ed.2d 496 (1958), including rules respecting the admission of lawyers to practice before the court. *E.g., Brown v. McGarr,* 774 F.2d 777 (7th Cir.1985); *Matter of Roberts,* 682 F.2d 105 (3d Cir.1982); *Sanders v. Russell,* 401 F.2d 241 (5th Cir. 1968). By analogy to the commerce clause, which the privileges and immunities clause closely resembles, *see, e.g.,* Tribe, *American Constitutional Law* § 6–33 at 411–12 n. 19 (1978); Sunstein, *Naked Preferences and the Constitution,* 84 Colum.L.Rev. 1689, 1710 (1984); *see generally* Varat, *State "Citizenship" and Interstate Equality,* 48 U.Chi.L.Rev. 487 (1981), pursuant to a specific grant of authority by Congress, federal officers may adopt policies and rules which discriminate against citizens of some states, and benefit citizens of others. Indeed, this distributive and allocative function between the states is the essence of the federal government. Frazier's suggested distinction between "local" and "national" federal officers misperceives the basis for federal authority.

■ Many federal officers are "local" to the extent of geographical restraints on authority. The essence of the federal office, however, is its exercise on behalf of the entire nation, even though the authority is limited to a "local" area. The rules Frazier challenges were adopted pursuant to a congressional grant of authority. Frazier is a citizen of the relevant political community, the United States of America, with representation in its legislative body. He is not a powerless outsider in need of the protection of the privileges and immunities clause, and that clause provides him with neither a shield nor a lance.

*Equal Protection*

Frazier's more significant constitutional challenge advances under the aegis of the equal protection component of the due process clause of the fifth amendment. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct.

still qualified to practice before this Court

pursuant to the requirements set out herein.

693, 98 L.Ed. 884 (1954). As with most equal protection assessments, the court's first determination is the applicable level of scrutiny. Frazier urges that we apply either strict scrutiny or intermediate-level scrutiny in our constitutional balancing. We find neither appropriate.

■ When a law disadvantages a suspect class or impinges a fundamental right, we will examine that law through the magnifying glass of strict scrutiny. Frazier invokes both predicates. The first is manifestly inapplicable; Frazier is not a member of a suspect class. His assertion that his lack of political power as an out-of-state resident is akin to that of aliens or racial and national minorities, recognized suspect classes, is not persuasive. As a citizen, insofar as federal actions are concerned he is not an outsider lacking political power, as that concept is understood in the equal protection analysis. *See generally* Sunstein, *supra.* As to the second factor, a right is not fundamental unless it is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 1296, 36 L.Ed.2d 16 (1973).[5] We find no fundamental right implicated by the admission rules of the Eastern District. *See Matter of Roberts,* 682 F.2d 105 (3d Cir.1982). The rubrics of strict scrutiny have no application in our constitutional testing of the subject rules.

■ Nor is intermediate-level scrutiny, appropriate. *See City of Cleburne v. Cleburne Living Center, Inc.,* —— U.S. ——, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Frazier is not burdened by an immutable trait and is not a member of a group traditionally subject to mistreatment. *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). We do not find intermediate-level scrutiny applicable.

■ Having ruled out the strict and intermediate levels, there remains only the inquiry whether the rules are rationally related to a legitimate governmental purpose, the least demanding of the three standards. *But see Cleburne,* —— U.S. at ——, 105 S.Ct. at 3260, 87 L.Ed.2d at 327 (Stevens, J., concurring); *Plyler,* 457 U.S. at 230, 102 S.Ct. at 2401 (Marshall, J., concurring); Hutchinson, *More Substantive Equal Protection? A Note on Plyler v. Doe,* 1982 Sup.Ct.Rev. 167. Typically the "law" under examination will pass constitutional muster unless it creates a classification "whose relationship to an asserted goal is so attenutated as to render the distinction arbitrary or irrational. *See Zobel v. Williams,* 457 U.S. 55, 61–63 [102 S.Ct. 2309, 2313–14, 72 L.Ed.2d 672] (1982); *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 535 [93 S.Ct. 2821, 2826, 37 L.Ed.2d 782] (1973)." *Cleburne,* —— U.S. at ——, 105 S.Ct. at 3257, 87 L.Ed.2d at 324.

■ The stated and implicit governmental purpose served by the challenged rules is legitimate: the rules seek to foster the efficient and effective administration of justice. We must ascertain whether the relationship of the rules to that purpose is so attenuated that the rules are not rationally related to the purpose they ostensibly serve.

A review of the regulatory scheme established by the rules is critical to a determination of their validity. Rule 21.2 imposes two requirements on lawyers who seek admission to the bar of the Eastern District: (1) they must be members in good standing of the Louisiana bar, and (2) they must either reside or maintain a law office in Louisiana. Rule 21.3.1 provides the vehicle for ongoing enforcement of Rule 21.2, for, as amended, it requires the members of the bar of the Eastern District to certify annually that they continue to meet its requirements.

---

**5.** For a discussion of the difference between fundamental rights under the privileges and immunities clause and those rights under the equal protection clause, *see* Varat, *supra,* 48 U.Chi.L. Rev. at 513–15; Morgan, *Fundamental State Rights: A New Basis for Strict Scrutiny in Federal Equal Protection Review,* 17 Ga.L.Rev. 77, 89 n. 62 (1982) (questioning validity of the distinction).

These rules do not prohibit lawyers who are not admitted in the Eastern District from practicing before that court. Rule 21.5 governs admissions *pro hac vice*, permitting a "member in good standing of the bar of any [federal] court ... or the highest court of any state" to be admitted on motion to participate in a particular case. The rule requires, however, that a lawyer admitted *pro hac vice* be associated with counsel who is a member of the bar of the Eastern District. The requirement that counsel admitted *pro hac vice* be affiliated with local counsel may be waived under Rule 21.6 if a party who is not a resident of the Eastern District "would suffer hardship by joinder of local counsel, and the obligations and duties of counsel in the particular litigation will be fulfilled."

Frazier urges that the Eastern District's regulatory scheme irrationally discriminates against members of the Louisiana bar who neither reside nor maintain an office in Louisiana, and thereby violates the fifth amendment's equal protection component. We are not convinced. We find the rules reasonably related to their intended purpose.

The evidence before the district court included the testimony of judges Morey L. Sear and Veronica D. Wicker, magistrates Ingard O. Johannesen and Michaelle Wynne, and clerk of court Loretta Whyte, all of the Eastern District. Their testimony was of one voice: lawyers admitted *pro hac vice*, who neither reside nor maintain an office in Louisiana, fail to comply with the local rules and impede the efficient administration of justice more than members of the bar of the Eastern District. This criticism included non-resident members of the bar of Louisiana.

The experiences of the five witnesses in the functioning of the court in the Eastern District of Louisiana suggests that outside counsel frequently impose an additional burden on the efficient administration of a trial docket. Not being readily available, because of geographical separation from the court, is the principal difficulty noted.

We harbor no doubt that the rules are as overinclusive in lumping all non-residents together as they are underinclusive in lumping together all lawyers who reside or maintain offices in Louisiana.[6] On the basis of the evidence, however, we conclude that the judges of the Eastern District acted in a reasonable manner in drawing the distinction.[7] The record reflects no invidious, discriminatory or otherwise inappropriate basis for the rules.

Although Frazier may not be admitted to the bar of the Eastern District, he is not prohibited from practicing before that court. As the district court found, "applications for admission *pro hac vice* are granted as a matter of course in the Eastern District" and "Frazier would not be denied admission on this basis if he complied with Rule 21.5." 594 F.Supp. at 1181. These findings are not challenged on appeal.[8] Frazier insists that permitting his

---

**6.** Any lawyer admitted to the bar of Louisiana who resides or has an office there meets this admission requirement. As attested, the smooth and efficient handling of the business of the court, including quick responses to appearance demands, is at the core of these rules. The court is aware that lawyers living or residing in Shreveport, Monroe, Lake Charles, and Lafayette, all within Louisiana but outside the Eastern District, are at a greater distance from the court in New Orleans than Frazier. Indeed, there are attorneys living or residing within the Eastern District who are more distant from New Orleans than Frazier's home in Pascagoula, Mississippi.

**7.** The latest available data reveals that 24 federal district courts have admission rules similar to those at issue here, requiring either a residence,

office, or both: M.D.Ala., N.D.Ala., D.Colo., D.Idaho, S.D.Ill., D.Kan., E.D.La., M.D.La., D.Me., E.D.Mo., W.D.Mo., D.Nev., E.D.N.C., D.N.D., S.D.Ohio, E.D.Pa., M.D.Pa., W.D.Pa., D.R.I., D.S.C., D.Utah, E.D.Va., W.D.Va., N.D. W.Va. The numbers and geographical spread speak for themselves. In addition, several district courts which allow non-residents to become members of their bars require the association of local counsel.

**8.** Indeed, in this circuit "[a]n applicant for admission *pro hac vice* who is a member in good standing of a state bar may not be denied the privilege to appear except 'on a showing that in any legal matter, whether before the particular district court or in another jurisdiction, he has been guilty of unethical conduct of such a na-

admission *pro hac vice* is not sufficient to avoid his equal protection challenge because under Rule 21.5 one appearing *pro hac vice* must associate local counsel. *Cf. Piper,* —— U.S. at —— n. 2, 105 S.Ct. at 1275 n. 2, 84 L.Ed.2d at 209 n. 2. He claims that this association imposes a financial burden on the client, non-resident counsel, or both.

The requirement that local counsel be associated with an out-of-state lawyer appearing *pro hac vice* has been approved, albeit in *dicta,* by the Supreme Court, *Piper,* —— U.S. at ——, 105 S.Ct. at 1280, 84 L.Ed.2d at 215, and this court, *Sanders v. Russell,* 401 F.2d at 248. We find significant in this case the fact that Rule 21.6 allows the waiver of the local counsel requirement and, according to Judge Sear, this waiver is granted for "good cause," such as a showing of "hardship to the litigant."

We are persuaded that the regulatory scheme of the Eastern District bears sufficient rational relationship to that court's goal of an efficient administration of justice. We are further persuaded that, in reality, Frazier's ability to practice in the Eastern District is not inappropriately burdened by the rules.

Frazier next challenges the admission rules as applied to him. To succeed in this challenge he must show discriminatory application of the rules, *i.e.,* that some members of the Louisiana bar who neither reside nor maintain an office in Louisiana have been admitted to the bar of the Eastern District. Frazier does not so contend; indeed, the evidence reflects no basis upon which such a contention could be made.

*Supervisory Power*

■ Finally, Frazier earnestly asks that we exercise our supervisory jurisdiction and either invalidate the rules or order him admitted. Typically we do not consider issues not first presented to the district court. The nature of this request, how-ever, involving our supervisory jurisdiction over the courts and the bar, validates our review. Having considered the matter, we decline to exercise our supervisory authority. *Cf. In re Evans; Sanders.*

The exercise of our supervisory power, at this time, would be inappropriate. The Fifth Circuit Judicial Council is currently reviewing the local rules of the nine district courts within the circuit.[9] Pursuant to the recently amended Fed.R.Civ.P. 83, the judicial council of each circuit is to examine all local rules to determine, in part, whether they "promote inter-district uniformity." Notes of Advisory Committee on the 1985 amendments to Rule 83. That examination is underway in this circuit. Simultaneously, a separate effort to harmonize the rules of Louisiana's three districts is in progress. We are reluctant to short-circuit or hamper those efforts in any way by precipitous action, particularly where no harm to Frazier has been demonstrated. We would merely note in passing, and without indicating any view on the merits, that in this circuit, only Middle Louisiana has a rule similar to those here challenged.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

IRVING L. GOLDBERG, Circuit Judge, dissenting:

I dissent because I do not believe that the challenged residency-or-office requirement can withstand even the most deferential judicial review.

The majority correctly notes that the challenged rules are both overinclusive and underinclusive. *See* majority opinion, *supra,* at 1054. General rules tend to be imprecise. The question in deferential equal protection analysis is *how* imprecise the challenged rules are or, as the majority puts it, whether the rules create "a classification 'whose relationship to an asserted goal is so attentuated as to render the

---

ture as to justify disbarment of a lawyer admitted generally to the bar of the court.'" *In re Evans,* 524 F.2d 1004, 1007 (5th Cir.1975), *quoting Sanders v. Russell,* 401 F.2d at 247–48.

**9.** The judicial council of the Fifth Circuit is composed of all circuit judges in active service and nine district judges, one from each district.

distinction arbitrary or irrational.' " *Id.* at 1053 (quoting *City of Cleburne v. Cleburne Living Center*, —— U.S. ——, ——, 105 S.Ct. 3249, 3257, 87 L.Ed.2d 313, 324 (1985)).[1] The Supreme Court has described the legal standard applicable in deferential equal protection analysis as follows:

> A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920).

*Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (applying rationality review).[2] Upon a review of the record in this case I conclude that the challenged rules are indeed unreasonable and arbitrary.

According to the majority, the stated and implicit goal of the residency-or-office rules is "to foster the efficient and effective administration of justice." Majority opinion, *supra*, at 1053; *see also Matter of Frazier*, 594 F.Supp. at 1183. It cannot be enough for these purposes that particular administrators or bureaucrats "like" the challenged rules or think that they are a good idea since they have always been the rules. Yet an examination of the trial testimony reveals that this is essentially the justification that has been offered in support of these rules.

The defendants in this case put on five witnesses at trial: the clerk of the Eastern District Court, two magistrates from the Eastern District, and two judges from the

Eastern District. As might be expected, all five witnesses made sweeping, conclusory declarations to the effect that their residency-or-office rules were a reasonable means of furthering the legitimate governmental goal of efficient and orderly administration of justice. *See, e.g.,* Tr. at 216, 233, 246, 270, 291. Beyond these self-serving conclusions of law, however, several interesting themes emerge from a review of the testimony: (1) the local rules are, as it were, sacrosanct, and any departure from them would lead swiftly and inevitably to ruinous chaos and certain disaster; (2) nonresident lawyers and other outsiders (the "out-of-staters") have a bad attitude in that they show insufficient interest in or respect for the local rules; (3) the "out-of-staters" are the main cause of trouble in the Eastern District.

Clerk Whyte testified that "Lawyers in Louisiana give us fewer problems than lawyers outside Louisiana. And to tell you the truth, I wondered why myself." Tr. at 162. According to Whyte,

> Also they are—again, not universally, but generally more often, I will say more often less responsive. It is not as easy to get them to return a telephone call. It's more difficult to get them to return a telephone call, and generally to comply with the rule when they have been spoken to.

*Id.* at 156.

Magistrate Johannesen elaborated on the defects of out-of-state lawyers as follows:

> Well, the problem I've encountered with the out-of-state lawyers are that they come into a case, then I tell them to

---

**1.** *Cf.* Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif.L.Rev. 341 (1949) (sustaining a classification that is both overinclusive and underinclusive "requires both the finding of sufficient emergency to justify the imposition of a burden upon a larger class than is believed tainted with the Mischief and the establishment of 'fair reason' for failure to extend the operation of the law to a wider class").

**2.** *See Matter of Frazier*, 594 F.Supp. 1173, 1180 (E.D.La.1984):

> The basic issue before the Court is whether this disparate treatment between resident and

nonresident members of the Louisiana bar is supported by a sufficiently weighty governmental purpose and whether the means chosen in Rule 21.2 are sufficiently related to that end.

*Cf. Schware v. Board of Bar Examiners*, 353 U.S. 232, 239, 77 S.Ct. 752, 756, 1 L.Ed.2d 796 (1957) ("A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.").

go get the rules and read the rules and follow the rules, which most of them won't do....

....

They drop out of the case without notifying the court. They won't file a motion to withdraw like the rule requires, and they just create a lot of problems.

....

... [T]he out-of-state lawyer ... just wants more than he should get. And most of them, we just don't get the courtesies from them that we should get from a lawyer.

*Id.* at 178–80. Magistrate Wynne related similar experiences with out-of-state lawyers:

Well, generally they've been bad experiences. We have a lot of trouble controlling out-of-state lawyers. Generally they are not familiar with our local rules, the pleadings many times do not conform with the manner of pleading that's acceptable in the Eastern District of Louisiana. I've had difficulties in certain situations.

*Id.* at 201. As examples of these difficulties Magistrate Wynne mentioned the following:

Well, say you represent a client, and just for an instance, instead of filing under our rules and proper notice pleading, you get an improper pleading.... Also, they improperly send it to me. This happens all the time, and I read the motion—they call it a rule—and I look at it and say, "Well, gee, this person ought to have this motion heard, but this lawyer has done it in improper form." Now, what do you want me to do, sanction that lawyer? Call him up and tell him, "I'm going to hear your motion, but you are going to pay $200 to the court?" What do I do? I call him up, and say, "Why can't you follow our local rules?"

*Id.* at 221–22.

We've had a lot of problems with the local rules about filing things. I've had out-of-town counsel and out-of-state counsel mail pleadings to me, "Dear Magistrate Wynne, Enclosed please find this motion." I'm not the proper person to receive those. The clerk of the court is. And that has caused problems because I will give it to the clerk of court. Please file this document, et cetera, and maybe they will need an expedited hearing, but they haven't complied with our local rules....

*Id.* at 203. According to Magistrate Wynne, many of these problems could have been avoided if the attorney had been in closer proximity:

Q. In closer proximity. How close?

A. If he could have gotten, if he could have come without—or would have willingly come to our courthouse within an hour of anything you needed, or two hours.

....

Q. Well, that's true, though, whether he's in Biloxi [Mississippi] or whether he is in Lake Charles [Louisiana]; is it not?

A. I would presume so, but I will tell you in all honesty, and I am under oath, I have not had problems with lawyers that practice in the Western District of Louisiana. They don't give the Eastern District any trouble.

Q. You do recognize that's about twice as far?

A. I know, sir. I don't know why it is....

*Id.* at 226.

Finally, Judges Wicker and Sear testified to the intractable problems presented by out-of-state lawyers. Judge Wicker stated that

With our docket in this district, you cannot be a watchdog or a policeman on every attorney that comes into this court. The only resource that you have is to have control over the attorneys that appear. And if they are from out-of-state, you lose that control, and it can cause havoc with your docket.

*Id.* at 246.[3] Judge Sear summarized his experience with out-of-state attorneys as follows:

I find that lawyers who come from out-of-state are more interested in the obligations that they have to the courts before [which] they regularly practice than they do for our court. They have a greater respect for them, perhaps, but more than that, they focus their attention on those matters to the neglect of ours....

*Id.* at 261.[4]

I think, Mr. Sessions, that most lawyers that engage in practice in this district follow our local rules. I know those that practice in my court do. And they attempt conscientiously to follow those rules, and lawyers from out-of-state do not....

*Id.* at 272.

The testimony excerpted here is neither extraordinary nor inexplicable. Insularity and provincialism are not peculiar to the Eastern District of Louisiana but form part of a widespread, basic socio-cultural pattern.[5] This explains why, for example, most people cheer for the "home team," no matter how bad it is. Similarly, in our vocabulary the outsider is one who behaves in "outlandish" ways.[6] Nevertheless, when basic protections guaranteed by the Constitution are at stake, socio-cultural explanations of this sort cannot suffice as justifications. The equal protection provisions, and our federalist scheme generally, impose a measure of cosmopolitanism and uniformity in areas where local interests would otherwise take their own course. This is particularly so in light of the Supreme Court's recent proposed amendment

to Fed.R.Civ.P. 83. *See* Order of April 29, 1985. According to the Advisory Committee Note on this amendment, "The expectation is that the judicial council will examine all local rules, including those currently in effect, with an eye toward determining whether they are valid and consistent with the Federal Rules, promote inter-district uniformity and efficiency, and do not undermine the basic objectives of the Federal Rules." Fed.R.Civ.P. 83, Notes of Advisory Committee on Rules (West 1985).

Even if the above considerations did not apply, there are still further weighty and compelling reasons that the appellees' position in this case is untenable. Once Frazier had made out a prima facie case of an equal protection violation, appellees could have responded in either of two ways: (1) They could have defended their rules, as applied to Frazier, on grounds that he did not qualify under some uncontested provisions of the rules (*e.g.*, that he was not in fact a member in good standing of the Louisiana bar); (2) or they could have made a showing that these contested rules, even if they do cause an insupportable hardship as applied to Frazier, can nevertheless be justified as constitutional in their general application. Appellees did not even attempt to rebut Frazier by the first route; and their showing on the second theory is patently insufficient as well.

A general defense of the residency-or-office rules challenged here would have to take something like the following form: Members of the Louisiana bar who do not reside or maintain an office in Louisiana cause, *on the average*, more "problems" in the Eastern District of Louisiana than those who do.[7] Appellees have not made a

**3.** *Cf. id.* at 186 (testimony of Magistrate Johannesen): "I think there would be chaos if we didn't have the [residency-or-office] rule."

**4.** *Cf. id.* at 213 (testimony of Magistrate Wynne): "I find out-of-state counsel ... are primarily interested in the development of the law of the state in which they reside. And they become deficient in Louisiana law."

**5.** *See, e.g.,* T.W. Adorno, E. Frenkel-Brunswik, D. Levinson & R.N. Sanford, *The Authoritarian*

*Personality* (1964); G. Allport, *The Nature of Prejudice* (1954); G. Myrdal, *An American Dilemma* (1944); R.S. Lynd & H.M. Lynd, *Middletown* (1929).

**6.** *See Oxford English Dictionary* 2023 (Compact ed. 1971).

**7.** *See* P. Brest & S. Levinson, *Processes of Constitutional Decisionmaking* 553–54 (2d ed. 1983): Let X and Y be two individuals or things similarly situated in all respects except as

legally probative showing on any such theory. Instead, the evidence introduced at trial was limited almost exclusively to experiences with *pro hac vice* practitioners— i.e., attorneys practicing in Louisiana who are *not* members of the Louisiana bar but who have retained local (Louisiana) counsel. At trial the distinction between members and non-members of the Louisiana bar was simply not observed:

A. Our office deals with attorneys primarily in the filing of papers, and we have found, not universally, certainly, but generally, and on the average, that attorneys located out-of-state submit papers for filing which do not comply with the local rules more frequently than do local attorneys.

Q. Would that apply to out-of-state lawyers who may or may not have been admitted generally or specifically for one case to practice before this court?

A. That would apply to out-of-state attorneys generally.

Q. Across the board, as it were?

A. Yes.

Tr. at 153 (testimony of Clerk Whyte). On the one occasion that this distinction was brought up (by the court), it emerged that the witness could report on only *two* non-resident members of the Louisiana bar:

Q. ... Now, do attorneys in that category, who have been admitted to the bar of Louisiana, but who have neither a residence nor a law office in Louisiana, present any problems, if you have had experience with any people like that from out-of-state?

. . . .

A. Well ... they weren't all that familiar, or they didn't care about our local rules, or they would confuse our local rules and our way of practice and pleading with other jurisdictions. I find that. I find just out-of-state lawyers in general—

THE COURT: Do you understand what Mr. Sessions is limiting his question to is attorneys who have passed the Louisiana Bar Exams, and been admitted to the bar, but didn't live in Louisiana?

THE WITNESS: Yes, sir. I'm thinking of one in particular that practices in Biloxi, Mississippi, not Mr. Frazier.

THE COURT: I wonder how many lawyers, ma'am, you would know in that category?

THE WITNESS: Two.

THE COURT: Two?

THE WITNESS: Two to my recollection. One practicing in Mississippi, and one is in Texas....

*Id.* at 214–15 (testimony of Magistrate Wynne). Appellees have advanced no reasons to suppose that out-of-state lawyers in general are a relevant comparison group for purposes of this case. And, indeed, there is every reason to think that they are not: Lawyers who seek *general* admission to the Eastern District bar thereby indicate an interest in developing an ongoing and regular practice in the District; they will have passed the Louisiana State bar examination—which is no mean feat, given the unique nature of Louisiana law; and they will have to pay annual dues of $40 for the first three years and $100 per year thereafter. *See* Appellant's Brief at 19–21; Appellant's Reply Brief at 3–4, 9–10. In short, they will have invested considerably more time and money to practice in the Eastern District on a continuing basis than those admitted on a *pro hac vice* basis. It

described below. The purpose and effect of the regulation are to reduce or eliminate a "mischief." It is not irrational to impose the regulation on X but not on Y if:

1. Application of the regulation to X reduces the total amount of mischief more than would its application to Y; or
2. X causes a greater amount of mischief than Y causes; or
3. Y's cost of complying with the regulation is greater than X's; or

4. exempting Y from the burden of the regulation will serve an ancillary objective; or
5. a. X possesses trait T, and
b. on the average, persons or objects possessing T are situated with respect to persons not possessing T as X (in 1 through 4) is situated with respect to Y; and
c. employing T as a classifying trait is more efficient than employing a narrower, more individualized trait.

is thus unreasonable and unfair to assume—without argument, evidence, or justification—that the experience with occasional *pro hac vice* practitioners is relevant to Mr. Frazier's application for *general* admission to the Eastern District bar.[8]

Even if appellees had limited their testimony to the proper comparison group, that testimony would still have to be dismissed as essentially worthless. Appellees have wholly failed to put forward any objective, systematic evidence in their defense:

> Q. Now, you testified earlier about, as I understood that you got filings, various documents for filing that were deficient more often from out-of-state lawyers than from in-state lawyers; is that correct?
>
> A. Uh-huh.
>
> Q. Now, you conducted a personal study of that, have you?
>
> A. If you mean by a study did we count them, no....

Tr. at 161 (testimony of Clerk Whyte).

> Q. You said ninety-eight percent of the out-of-state lawyers cause you those types of problems?
>
> A. That's right.
>
> Q. Now, what studies have you done to that end?
>
> A. Well, basically I just know what my docket is, and I know what lawyers I have, and what the problems I've had with them, and out-of-state lawyers just constantly give me the problems.
>
> Q. Is the answer that you haven't done any studies? Have you got any empirical evidence or data?
>
> A. Statistics?
>
> Q. Yes.

> A. No, I don't have any basic statistics.

*Id.* at 192 (testimony of Magistrate Johannesen).

> Q. Even Louisiana lawyers who do that, has it been your experience that they've been members of the bar of this court, or are just trying to practice without qualifying?
>
> A. I don't know, sir. I don't know.
>
> Q. You didn't keep any diary, keep any statistics of those kinds of cases, did you?
>
> A. No.

*Id.* at 205 (testimony of Magistrate Wynne).

> Q. You didn't keep a diary or any compilation of statistics or day-by-day recordation of problems you had with non-resident attorneys while you were a magistrate, did you?
>
> A. No.

*Id.* at 232 (testimony of Judge Wicker).

I do not make a fetish of statistics. But generalized, visceral reactions and vague, anecdotal reminiscences of this sort do not rise to the level of legally probative evidence; they cannot supplant the need for hard, empirical data when the Constitution's guarantee of the equal protection of the laws is at stake.[9] Thus, even if appellees' evidence had been relevant—which, as I have explained above, it is not—I would hold that it is insufficient as a matter of law.

---

**8.** It may be possible to make such a connection; but it is up to the appellees—not this court—to make it. *See Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 442, 102 S.Ct. 1148, 1161, 71 L.Ed.2d 265 (1982) (Blackmun, J., separate opinion) ("The State's rationale must be something more than the exercise of a strained imagination; while the connection between means and ends need not be precise, it, at the least, must have some objective basis."); *cf. Supreme Court of New Hampshire v. Piper,* — U.S. —, 105 S.Ct. 1272, 1278–80, 84 L.Ed.2d 205 (1985) (considering and rejecting arguments that nonresi-

dent State bar members would be less likely: 1) to become, and remain, familiar with local rules and procedures; 2) to behave ethically; 3) to be available for court proceedings; and 4) to do *pro bono* and other volunteer work in the State).

**9.** *Cf. Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (establishing standards of statistical proof); *Hazelwood School Dist. v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) (same).